In re GUGGENHEIM SMELTING CO.

(Circuit Court of Appeals, Third Circuit. November 24, 1903.)

No. 13.

1. CUSTOMS DUTIES—CONSTRUCTION—SMELTING AND REFINING METALS—CRUDE ORES—LEAD BULLION.

Tariff Act July 24, 1897, c. 11, § 29, 30 Stat. 210 [U. S. Comp. St. 1901, pp. 1626, 1957], relating to the importation of certain ores and metals to be refined or smelted in bonded warehouses, contains the proviso "that each day a quantity of refined metal equal to ninety per centum of the amount of imported metal smelted or refined that day shall be set aside, * * * and the exportation of the ninety per centum of metals * * * shall entitle the ores and metals imported under" said section to admission without payment of duty. Held, in regard to importations of lead bullion containing lead and antimony, that this means 90 per cent. of the pure metal contained in the crude metal as imported, as determined by assay at the time of importation, and not of the pure metal recovered by smelting and refining.

Gray, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of New Jersey.

Appeal from the decision of the United States Circuit Court reversing a decision of the Board of General Appraisers which affirmed

the assessment of duty by the collector of customs at the port of Perth Amboy. G. A. 5032.

For opinion below, see 121 Fed. 153.

Cortlandt Parker, Jr., for appellant.

Thomas Thacher, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

DALLAS, Circuit Judge. This is an appeal from an order of the Circuit Court for the District of New Jersey, reversing a decision of the Board of General Appraisers, and directing the collector of the port of Perth Amboy "to allow to be set aside and accept for export, in satisfaction of the bonds of the Guggenheim Smelting Company, ninety per centum of the lead and antimony, as smelted or refined by the said company from lead bullion imported under said bonds, and covered by the protests in evidence." The question, which this order resolved in favor of the importers, arises under section 29 of the act of Congress of July 24, 1897, entitled "An act to provide revenue for the government and to encourage the industries of the United States." This act is contained in 30 Stat. 151, c. 11 [U. S. Comp. St. 1901, p. 1626], and the section above referred to is as follows:

"Sec. 29. That the works of manufacturers engaged in smelting or refining metals, or both smelting and refining, in the United States may be designated as bonded warehouses under such regulations as the Secretary of the Treasury may prescribe: provided, that such manufacturers shall first give satisfactory bonds to the Secretary of the Treasury. Ores or metals in any crude form requiring smelting or refining to make them readily available in the arts, imported into the United States to be smelted or refined and intended to be exported in a refined but unmanufactured state, shall, under such rules as the Secretary of the Treasury may prescribe, and under the direction of the proper officer, be removed in original packages or in bulk from the vessel or other vehicle on which they have been imported, or from the bonded warehouse in which the same may be, into the bonded warehouse in which such smelting or refining, or both, may be carried on, for the purpose of being smelted or refined, or both, without payment of duties thereon, and may there be smelted or refined, together with other metals of home or foreign production: provided, that each day a quantity of refined metal equal to ninety per centum of the amount of imported metal smelted or refined that day shall be set aside, and such metal so set aside shall not be taken from said works, except for transportation to another bonded warehouse or for exportation, under the direction of the proper officer having charge thereof as aforesaid, whose certificate, describing the articles by their marks or otherwise, the quantity, the date of importation, and the name of the vessel or other vehicle by which it was imported, with such additional particulars as may from time to time be required, shall be received by the collector of customs as sufficient evidence of the exportation of the metal, or it may be removed under such regulations as the Secretary of the Treasury may prescribe, upon entry and payment of duties, for domestic consumption, and the exportation of the ninety per centum of metals hereinbefore provided for shall entitle the ores and metals imported under the provisions of this section to admission without payment of the duties thereon: provided further, that in respect to lead ores imported under the provisions of this section the refined metal set aside shall either be re-exported or the regular duties paid thereon within six months from the date of the receipt of the ore. All labor performed and services rendered under these regulations shall be under the supervision of an officer of the customs, to be appointed by the Secretary of the Treasury, and at the expense of the manufacturer." 30 Stat. 210 [U. S. Comp. St. 1901, p. 1957].

The importations in question were subject to duty under the act, and the claim of this importer is that it was, by the excepting provisions of section 29, exempted from their payment. The validity of this claim, subject to the performance by the claimant of the conditions prescribed by the section, has not been disputed. The controversy is only as to whether the requirement that 90 per centum of the metals shall be set aside for export is complied with by setting aside "ninety per centum of the lead and antimony as smelted or refined by the said company," or whether there should be set aside 90 per centum of the pure metal actually contained in the imported crude metal, as determined by assay at the time of its importation. The question thus presented is one of construction. It calls for the ascertainment of the legislative intent, and this, if possible, is to be discovered by determining the meaning of the words which were used to express it. They are, "that each day a quantity of the refined metal equal to ninety per centum of the amount of imported metal smelted or refined that day shall be set aside." This, we think, is not the language that would have been employed if it had been intended that the quantity of refined metal to be set aside each day was to be but 90 per centum of the refined metal recovered each day from or out of the imported metal. This might readily have been said, but it was not said. On the contrary, the requirement is, in terms, that the 90 per centum shall be "of the amount of the imported metal"—not of the metal smelted or refined "from" it, as the order appealed from assumes, but of the metal imported under the provisions of this section, and which it entitles "to admission without payment of the duties thereon." The fact that, in the clause immediately under consideration, it is stated that the metal to be set aside each day is to be of the metal smelted or refined that day, does not militate against our interpretation of it. The order of the Circuit Court, in the phrase "as smelted or refined by the said company," reads into the act the word "as"; and, if this interpolation were warranted, the contention of the appellee might be a plausible one. But, in our opinion, it is not warranted. We have no doubt as to the purport or purpose of the words actually used. The material to be set aside is refined metal, and from the work of each day that metal is to be obtained. This is plain, but we think it is also obvious that the quantity to be set aside is not to be 90 per centum of the refined metal, but is to be "equal to ninety per centum of the amount of imported metal." The imported metal smelted or refined can be no other than the crude metal, for that only is imported; and it is that, and that only, which is smelted or refined. Pure metal is not imported, nor is it subjected to smelting or refining. It is brought into existence after the importation has taken place, and, though this is accomplished by smelting or refining, it certainly is not the pure metal itself, but the imported crude metal, to which the operation of smelting or refining is applied.

Our decision of this case might well be rested upon what has been said respecting the directly pertinent portion of section 29, but some of the extrinsic considerations which the record suggests will now be briefly referred to. It is undoubtedly true that the act of 1897 was intended not only "to provide revenue," but also "to encourage the in-

dustries of the United States." But this latter intent was effectuated by levying protective duties, and this its twenty-ninth section did not do. It did not impose, but excepted from duties, and this for a reason which is quite apparent. Metals imported and dealt with under its provisions do not enter into the markets of the United States, and consequently do not come into competition with any of their industries. This, we are convinced, was the real and only ground upon which the exemption to smelters and refiners was accorded, and there is nothing whatever in the act to support the contention that it was designed that this particular class of importers should, to any extent, be especially privileged to put upon the markets of the United States, free of duty, a commodity which, when imported by others, was by the same act made subject to duty. Such a purpose cannot be, upon mere conjecture, imputed to Congress. It would not be in furtherance of the protective policy of the act. It would be subversive of it. It would impair the efficacy of the repression interposed to encourage our industries, and in such manner as to give to some of them an advantage over others. We cannot concur in the view that the object of the provision that only 90 per centum of the imported metal need be exported was to leave in the hands of those engaged in smelting or refining a bonus to foster or promote those industries. No such intent is expressed in the act, but, on the contrary, it clearly appears that protective duties, affecting all alike, were the only means by which it was proposed "to encourage the industries of the United States," and that nothing in the nature of a subsidy, bounty, or reward was intended to be bestowed upon any of them. The correct explanation of this provision is very simple. In administering the tariff acts of October 1, 1890 (26 Stat. 567, c. 1244) and August 27, 1894 (28 Stat. 509, c. 349), it had been found that some loss always occurs in smelting or refining, so that the whole quantity of pure metal actually contained in the crude metal imported cannot be actually recovered; and it was in view of this fact that the act of 1897, which in this respect was amendatory of the previous acts, required, not that the whole quantity of pure metal imported should be subsequently exported, but only a quantity equal to 90 per centum thereof. It may be, as has been insisted, that this allowance of 10 per centum for wastage is, at least as to antimony, not as great as it ought to be, but the question thus raised is for consideration by Congress. It is not, under this statute, for solution by the courts.

This opinion need not be further extended. The only question presented by the record is, as we have said, one of construction; and as, upon that question, we find ourselves unable to concur in the conclusion which was reached by the learned judge below, the order of the Circuit Court must be reversed, and the cause will be remanded to that court, with direction to enter a judgment affirming the decision of the Board of General Appraisers, by which the protests of the Guggenheim Smelting Company were overruled and the decision of the collector in each case was affirmed.

GRAY, Circuit Judge, dissents.